UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

MORRIS PAUL ROGERS,

                Petitioner,                    Case No. 1:07-cv-783

v.                                       Honorable Robert J. Jonker

THOMAS K. BELL,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial, Petitioner was convicted in the Muskegon County Circuit Court of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MICH. COMP. LAWS § 750.227b. On July 21, 2003, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to respective prison terms of 23 to 40 years, 2 to 15 years and 2 years. In his *pro se* petition, Petitioner raises seven grounds for relief, as follows:

I.      WAS [PETITIONER] DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO REQUEST A JURY INSTRUCTION ON SELF-DEFENSE, A DEFENSE WHICH WAS SUPPORTED BY THE EVIDENCE?

II.     [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'[]S FAILURE TO INSTRUCT THE JURY THAT HE COULD NOT BE CONVICTED OF ASSAULT WITH INTENT TO MURDER IF HE ACTED UNDER THE INFLUENCE OF EMOTIONAL EXCITEMENT THAT WOULD MITIGATE MURDER TO MANSLAUGHTER HAD THE VICTIM DIED.

III.   [PETITIONER] WAS DEPRIVED [OF THE] ASSISTANCE OF COUNSEL BY THE DISTRICT COURT JUDGE'S FAILURE TO INSTRUCT [PETITIONER] ON SELF-REPRESENTATION.

IV.   WITHOUT A RETURN FILED FROM DISTRICT COURT[,] THE CIRCUIT COURT NEVER OBTAINED IN PERSONAM JURISDICTION OVER [PETITIONER] AND[,] THUS[,] HIS CONVICTION WAS PROCURED IN VIOLATION OF [] STATE AND FEDERAL CONSTITUTIONS.

`

V.   THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON DEAD-LOCKED JURIES (CJI 2ND 3.12) AND INSTEAD RETURNED THE VERDICT TO THE FOREPERSON WITH INSTRUCTION TO CIRCLE THE CORRECT VERDICT STATING THERE WERE TWO MARKS FOR COUNT ONE.

VI.   THE TRIAL COURT HAD A DUTY TO INSTRUCT THE JURY ON ALL OF THE ELEMENTS NECESSARY TO DETERMINE IF THE PROSECUTION HAD PROVEN COUNTS TWO AND THREE BEYOND A REASONABLE [DOUBT].

VII.   THE TRIAL COURT ERRED WHEN IT ALLOWED TESTIMONY FROM NON-TESTIFYING WITNESSES AND WHEN IT ALLOWED PROSECUTION WITNESSES TO PERJURE THEMSELVES UNDER OATH.

(Attach. C to Pet. at 1-6, docket #1.)  Respondent filed an answer to the petition (docket #8) stating

that the grounds should be denied because they are either procedurally defaulted or have no merit.

Upon review and applying the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110

STAT. 1214 (AEDPA) standards, I find that habeas grounds I, II and III are without merit and habeas

grounds IV, V, VI and VII are procedurally defaulted.  Accordingly, I recommend that the petition

be denied.

<u>**Procedural History**</u>

**A.      Trial Court Proceedings**

The state prosecution arose from the shooting of Kenyatta Jones at a home in Muskegon Heights, Michigan.  The victim, who was gambling with Petitioner in the early morning hours of January 18, 2003, was shot in the head.  Following a preliminary examination on March 6, 2003, Petitioner was bound over on charges of assault with intent to commit murder, assault with intent to do great bodily harm less than murder, felon in possession of a firearm and felony-firearm. (Mar. 6, 2003 Prelim. Examination Hr'g (Prelim. Hr'g) at 16, docket #12.)

Petitioner was tried before a jury beginning June 25, 2003 and ending June 27, 2003. The prosecution called Sandra Jones as its first witness.  (June 25, 2003 Trial Tr. Vol. II (Tr. II), docket #14.)  In the early morning hours of January 18, 2003, several people were gambling in the basement of Sandra's house in Muskegon Heights.  (Tr. II, 177.)  At one point, Sandra heard arguing in the basement and went downstairs to investigate.  (Tr. II, 179.)  She found Petitioner arguing with everyone at the table.  She told Petitioner to leave.  (Tr. II, 180-81.)  Sandra managed to get Petitioner up the stairs and out of the house.  (Tr. II, 181.)  By the time she got Petitioner out of the house, Kenyatta Jones, Maurice Taylor and a couple more people were standing behind Sandra at the top of the stairs.  (Tr. II, 182-83.)  When Petitioner saw Kenyatta, he opened the door, pushed Sandra out of the way, said "there go that bitch in the red shirt," pointed the gun at Kenyatta's head and shot Kenyatta.  (Tr. II, 182, 184-85, 210-11.)  Sandra never saw Kenyatta with a gun.  (Tr. II, 185, 190.)  She also did not see Petitioner's gun until he pulled it out.  (Tr. II, 221.)  After being shot, Kenyatta grabbed his head and fell down the stairs.  (Tr. II, 188.)  Sandra called 911.  (Tr. II, 188.) Sandra noticed Petitioner had run away.  (Tr. II, 192.)  She also saw Wilbur Sargent run upstairs

after the shooting. (Tr. II, 193.)  Although the inside window of a double-pane window in Sandra's kitchen had a round bullet hole in it, the police never found the bullet. (Tr. II, 190.)  On cross-examination, Sandra testified that she was celebrating her birthday that evening and had two beers to drink. (Tr. II, 198-200, 202.)

Valerie Deloach also testified for the prosecution.  (Tr. II, 227.)  Valerie was previously convicted of two felonies:  larceny in a building and unlawful use of a credit card.  (Tr. II, 227-28.)  She was not offering her testimony pursuant to any plea agreement.  (Tr. II, 231.)  In the early morning hours of January 18, 2003, Valerie was at Sandra's house but had returned to her house to retrieve a coat. (Tr. II, 228, 247-48.)  Around 2:00 a.m. on January 18, 2003, Valerie heard Sandra's voice and ran toward Sandra's home. (Tr. II, 231.)  Valerie saw Sandra standing in the doorway on the side of her house.  Sandra was telling Petitioner to leave.  (Tr. II, 233.)  Petitioner was standing outside the door.  (Tr. II, 234.) Petitioner was saying that he was tired of "them little bastards." (Tr.  II, 235.)  Valerie noticed that a man by the name of Dee-Lee was coming out of the house but Sandra was blocking him.   Dee Lee was trying to grab Petitioner and push him.  (Tr. II, 235-37.)  Petitioner told Dee-Lee to "[k]eep your fucking hands off me." (Tr. II, 236.)

Valerie testified that she saw Kenyatta Jones and Maurice Taylor standing on the stairs. (Tr. II, 237.)  Other people were also starting to come up the stairs. (Tr. II, 238.)  Petitioner said "I'm tired of the bitch in the red shirt."  Kenyatta replied, "fuck you" and "ain't nobody scared of you." (Tr. II, 239.)  Petitioner aimed the gun toward Kenyatta's head and shot him.  (Tr. II, 239-41.)  Valerie only heard one shot.  She did not see Kenyatta with a gun.  (Tr. II, 241-42.)  After he shot Kenyatta, Petitioner turned around and eventually walked away.   The gun was still in Petitioner's hands. (Tr. II, 244-45, 261.)  Valerie described the weapon as a black handgun. (Tr. II,

270.) Valerie testified on cross-examination that she had consumed part of a beer that night. (Tr. II, 263.)

The parties stipulated that Petitioner had been convicted of a felony and it was illegal for him to carry or possess a firearm on January 18, 2003. (Tr. II, 273.)

Maurice Taylor testified that he was at a birthday party at Sandra Jones' house on January 18, 2003. (Tr. II, 275-76.) Maurice arrived at Sandra's house at 2:00 a.m. Maurice went down to the basement and noticed people drinking and playing dice. Maurice was not drinking or gambling. (Tr. II, 277.) Maurice testified that Petitioner was drinking gin. (Tr. II, 281.) Maurice found Kenyatta Jones playing dice with seven to eight people, including Petitioner. (Tr. II, 277-78.) Petitioner was losing and started to argue with Kenyatta and several other people. (Tr. II, 279.) When Petitioner became too loud, Sandra asked him to leave. Petitioner and Sandra then began pushing each other. Sandra escorted Petitioner up the stairs even though Petitioner tried to push his way back into the basement. (Tr. II, 280, 283-84, 303-04.) Maurice and Kenyatta also walked up the stairs to help Sandra. (Tr. II, 284-85.) At that time, Sandra and Petitioner were outside the house. (Tr. II, 286, 304.) When Maurice and Kenyatta got to the top of the stairs, Petitioner became angrier. (Tr. II, 287-88.) Petitioner said "[y]ou're all going to get it, especially the little bitch in the red shirt." (Tr. II, 288.) Kenyatta then made some comment to Petitioner about not being tough. Petitioner immediately snatched open the screen door, pushed Sandra aside and shot Kenyatta. (Tr. II, 289-90.) Maurice testified that he heard a gunshot and saw a flash of light and Petitioner's fist pointing toward Kenyatta's head. (Tr. II, 291-92.) After the gunshot, Maurice fell to the floor because he had metal debris in his eyes. (Tr. II, 292-95.) When Maurice could see in one eye, he

went downstairs. He found Kenyatta lying on the floor in a pool of blood. (Tr. II, 295.) Maurice never saw the victim with a gun. (Tr. II, 296.)

Dr. Erik Sievertsen testified as an expert in emergency medicine. Dr. Sievertsen stated that he treated Kenyatta Jones and Maurice Taylor on January 18, 2003 at 5:00 a.m. (Tr. II, 310-12.) Dr. Sievertsen found two bullet holes in Kenyatta's skull but did not find any bullet fragments. (Tr. II, 314, 316.) He noticed swelling outside of Kenyatta's skull. (Tr. II, 327.) Kenyatta was released from the hospital because Dr. Sievertsen did not find any abnormalities with his exam other than the two bullet holes. (Tr. II, 319, 321.) Dr. Sievertsen also testified that Kenyatta's wounds were consistent with gunshot wounds. (Tr. II, 324.) Dr. Sievertsen finally stated that any gunshot wound to the head can be life threatening. Kenyatta's injuries, however, were not life threatening. (Tr. II, 326, 328-29.)

The victim, Kenyatta Jones, testified that he was twenty-six years old at the time of the trial. (Tr. II, 330.) Kenyatta arrived at Sandra Jones' house on January 18, 2003 a little after one or two in the morning. (Tr. II, 331.) Kenyatta went downstairs to shoot dice. (Tr. II, 332.) Kenyatta knew Maurice Taylor and Petitioner. (Tr. II, 332.) After approximately 45 minutes of playing dice, Kenyatta and Petitioner began to argue. Petitioner was mad because he was losing. (Tr. II, 335.) Sandra then came and told Petitioner to leave. (Tr. II, 337.) As Petitioner was going up the stairs, he was trying to tussle with Sandra. Petitioner, who was climbing the stairs backwards, tried to push Sandra back down. (Tr. II, 337, 365.) Sandra eventually managed to push Petitioner up the stairs. (Tr. II, 337-38.)

When Kenyatta heard something going on upstairs, he and Maurice Taylor went to investigate. (Tr. II, 338-39.) At the top of the stairs, Kenyatta saw that Sandra was in the doorway

and Petitioner was outside. (Tr. II, 339-40.) Maurice was beside Kenyatta but about one step behind him. (Tr. II, 341.) At that time, Petitioner said "especially that nigger right there" to Kenyatta. Kenyatta replied "[y]ou ain't all that." Petitioner said something "bitch" and pulled out his gun and shot Kenyatta. (Tr. II, 343-44.) Kenyatta testified that he saw the gun pointed toward his face. (Tr. II, 345.) Kenyatta ducked as soon as he heard the gunfire. (Tr. II, 346.) The bullet hit the top of Kenyatta's head. (Tr. II, 354.) Kenyatta did not have a gun. He also testified that Maurice and Sandra never pulled out a gun. After being shot, Kenyatta grabbed his head and fell down the stairs. (Tr. II, 347.) Several people in the basement ran past Kenyatta. (Tr. II, 349.)

Wilbur Sargent testified that Petitioner is his brother-in-law. (June 26, 2003 Trial Transcript Vol. III (Tr. III) at 386-87, docket #15.) On January 18, 2003, Wilbur rode with Petitioner to Sandra Jones' house. Petitioner had borrowed Anthony Sargent's car. Wilbur and Petitioner arrived around 2:30 a.m. to gamble and drink. (Tr. III, 387-88.) When they arrived at Sandra's house, Wilbur and Petitioner went downstairs. (Tr. III, 389.) As Petitioner began to lose, Kenyatta Jones argued with Petitioner. (Tr. III, 393-94.) Petitioner laughed it off first. (Tr. III, 394.) While players would talk trash during dice, Wilbur testified that Kenyatta was "disrespecting" Petitioner. Petitioner then started talking trash back to Kenyatta. (Tr. III, 395.) When it started to get loud, Sandra asked Petitioner to leave. (Tr. III, 398-99.) Sandra and her boyfriend, Dee-Lee, escorted Petitioner up the stairs and out the door. (Tr. III, 400-02.) Kenyatta and Maurice were behind Wilbur. Five or six of Kenyatta's friends were also behind Wilbur. (Tr. III, 406, 411-12, 415.) Kenyatta was still talking trash to Petitioner up the stairs. (Tr. III, 411-12, 459-60.) When he got to the top of the stairs, Wilbur walked straight out the door. (Tr. III, 405, 412.) The group of five to six individuals, who were behind Wilbur, also walked out the door. All of them were still

talking trash to Petitioner. (Tr. III, 415.) While Wilbur did not witness them come out of the door, he heard them come out the door. (Tr. III, 415-16.)

Wilbur testified that he did not see a gun on Kenyatta that night. (Tr. III, 417, 421.) Wilbur also did not see a gun on Petitioner. (Tr. III, 417.) When he heard the gunshot, Wilbur ducked and looked in the direction of the shot. He saw Petitioner but Wilbur did not know if Petitioner had shot Kenyatta. (Tr. III, 418, 432.) Wilbur noticed people running towards the basement. (Tr. III, 419.) Wilbur eventually took the car without Petitioner. (Tr. III, 433.) Wilbur was aware that Petitioner owned a gun. (Tr. III, 439.)

Anthony Sargent testified that he loaned his car to his brother-in-law, Petitioner, on January 18, 2003. (Tr. III, 471.) Early that morning, Wilbur woke Anthony up and they went to Petitioner's house. Wilbur mentioned that "[t]hey said that [Petitioner] shot somebody." (Tr. III, 475.) Once Anthony arrived at Petitioner's house, he called Petitioner but Petitioner would not tell him where he was. (Tr. III, 476.) Anthony testified that Petitioner never mentioned that he shot anyone. (Tr. III, 481.)

Muskegon Heights Police Officer Lovely Jamison testified that she received a call about a possible shooting on January 18, 2003 around 4:37 a.m. (Tr. III, 482-83.) After Officer Jamison entered the home, she went downstairs and found Kenyatta Jones lying on the basement floor. (Tr. III, 484-85.) Officer Jamison never discovered any evidence that Kenyatta or Maurice Taylor had a gun. (Tr. III, 497, 503.) After the ambulance arrived, Officer Jamison began to look for the suspect but was unsuccessful. (Tr. III, 486-88.)

Muskegon Heights Sergeant Gary Cheatum testified that he received a call on January 18, 2003 about a possible shooting. (Tr. III, 506.) When he arrived, Sergeant Cheatum noticed

Kenyatta Jones lying on the basement floor. Kenyatta's head was bleeding. (Tr. III, 506.) Sergeant Cheatum searched the area of the shooting, approximately ten feet from the door, but did not find a gun, shell casing or the bullet. (Tr. III, 509-10, 530, 532.) Sergeant Cheatum also searched the basement but did not find any guns. (Tr. III, 525.) Sergeant Cheatum never received any information that anyone else had a gun besides Petitioner that night. (Tr. III, 510.)

Around 5:00 a.m., Sergeant Cheatum searched Petitioner's residence but they did not find Petitioner. Sergeant Cheatum eventually interviewed Anthony Sargent. (Tr. III, 511.) Anthony helped Sergeant Cheatum contact Petitioner on Anthony's Nextel phone. (Tr. III, 518.) When Sergeant Cheatum asked Petitioner to come and speak to him, Petitioner mentioned that he was in Grand Rapids. Because not enough time had passed for Petitioner to be in Grand Rapids, Sergeant Cheatum mentioned his doubts to Petitioner. Petitioner hung up on Sergeant Cheatum. Sergeant Cheatum stated that Petitioner never mentioned self-defense in that conversation. (Tr. III, 520.) Sergeant Cheatum called Petitioner again about an hour and half later. During that conversation, Petitioner said "it was self defense. It was self defense. He pulled a gun on me." (Tr. III, 521-22.) Petitioner eventually turned himself in. (Tr. III, 524.) However, Sergeant Cheatum never recovered the gun. (Tr. III, 545.)

Muskegon Heights Police Officers Marvin Petty and Dennis Davis also responded to the call on January 18, 2003. (Tr. III, 551, 568.) Officers Petty and Davis corroborated Sergeant Cheatum's testimony. Officers Petty and Davis searched the crime scene but never recovered the gun, any shell casings or a bullet. (Tr. III, 553-54, 557, 570-72.)

At the conclusion of the trial, on June 27, 2003, the jury found Petitioner guilty of assault with intent to commit murder, felon in possession of a firearm and felony-firearm. (June 27,

2003 Trial Transcript Vol. IV (Tr. IV) at 675, docket #16.) On July 21, 2003, the trial court

sentenced Petitioner to 23 to 40 years imprisonment on the assault with intent to commit murder

conviction, a concurrent term of 2 to 15 years imprisonment for the felon in possession of a firearm

conviction[1] and a consecutive term of two years imprisonment on the felony-firearm conviction.

(July 21, 2003 Sentencing Transcript (S. Tr.) at 19-20, docket #17.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which

was filed by counsel on May 5, 2004, raised the following two issues:

I. WAS DEFENDANT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO REQUEST A JURY INSTRUCTION ON SELF-DEFENSE, A DEFENSE WHICH WAS SUPPORTED BY THE EVIDENCE?

II. WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO INSTRUCT THE JURY THAT HE COULD NOT BE CONVICTED OF ASSAULT WITH INTENT TO MURDER IF HE ACTED UNDER THE INFLUENCE OF EMOTIONAL EXCITEMENT THAT WOULD MITIGATE MURDER TO MANSLAUGHTER HAD THE VICTIM DIED.

(Def.-Appellant's Br. on Appeal, docket #18; Muskegon County Case Register of Actions at 4,

docket #11.)

Petitioner also filed a *pro per* supplement brief in the Michigan Court of Appeals.

In his supplemental brief, Petitioner requested the appellate court to consider the following claims:

---

[1]According to Petitioner's application for habeas corpus relief and the Michigan Department of Corrections Offender Tracking Information System, Petitioner was sentenced to 1 to 15 years for the felon in a possession of a firearm conviction. *See* Pet. at 1, docket #1; http://www.state.mi.us/mdoc/asp/otis2profile.asp?mdocNumber=156853. The Sentencing Transcript, however, provides that Petitioner was sentenced to 2 to 15 years. For purposes of this Report and Recommendation, I used the information provided by the Sentencing Transcript. *See* S. Tr. at 19-20.

I.   WAS DEFENDANT DEPRIVED OF HIS RIGHT [DUE TO] THE PROSECUTOR['S] FAILURE TO PROVE [THREE] PRIOR CONVICTIONS IN THE INFORMATION?

II.  WAS DEFENDANT DENIED ARRAIGNMENT BY THE DISTRICT JUDGE['S] FAILURE TO ARRAIGN DEFENDANT ON COUNT FOUR, THE CRIME OF ASSAULT WITH INTENT TO MURDER?

III. WAS DEFENDANT DEPRIVED [OF] ASSISTANCE OF COUNSEL BY THE DISTRICT COURT JUDGE['S] FAILURE TO INSTRUCT DEFENDANT ON SELF-REPRESENTATION?

IV.  WAS DEFENDANT DEPRIVED OF HIS FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW BY THE TRIAL JUDGE'S ERRONEOUS INSTRUCTIONS TO THE JURY?

V.   WAS DEFENDANT DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL [BECAUSE] THE TRIAL JUDGE[] ERR[ED] [BY] INSTRUCT[ING] THE JURY, THAT DEFENDANT WAS CONVICTED OF A FELONY.

(Def.-Appellant's Supp. Br., docket #19.)  By unpublished opinion issued on September 21, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* Sept. 21, 2004 Mich. Ct. Appeals' Opinion (MCOA Op.), docket #18.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised all of the claims raised before and rejected by the Michigan Court of Appeals.  By order entered April 26, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Apr. 26, 2005 Mich. Order, docket #19.)

C.   **Post-conviction relief**

On November 18, 2005, Petitioner filed a motion for relief from judgment in the Muskegon County Circuit Court, raising the following grounds:

I.     DID THE TRIAL COURT ERR WHEN IT STATED THAT THE CIRCUIT COURT HAD *IN PERSONAM* JURISDICTION WITHOUT A RETURN FILED FROM DISTRICT COURT?

II.    DID THE TRIAL COURT ERR WHEN IT FAILED TO INSTRUCT THE JURY ON DEAD-LOCKED JURIES (CJI 2ND 3.12) AND INSTEAD RETURNED THE VERDICT TO THE FOREPERSON WITH [THE] INSTRUCTION TO CIRCLE THE CORRECT VERDICT STATING THERE WERE TWO MARKS FOR COUNT ONE?

III.   DID THE TRIAL COURT HAVE A DUTY TO INSTRUCT THE JURY ON ALL OF THE ELEMENTS NECESSARY TO DETERMINE IF THE PROSECUTION HAD PROVEN COUNTS TWO AND THREE BEYOND A REASONABLE [DOUBT]?

IV.    DID THE TRIAL COURT ERR WHEN IT ALLOWED TESTIMONY FROM NON-TESTIFYING WITNESSES AND WHEN IT ALLOWED PROSECUTION WITNESSES TO PERJURE THEMSELVES UNDER OATH?

(Def.-Appellant's Pro Per Application for Leave to Appeal, docket #23.)  The circuit court issued an opinion and order denying the motion on February 27, 2006.  (*See* Feb. 27, 2006 Circuit Ct. Order, docket #23.)  Petitioner sought reconsideration, which was denied by the circuit court on March 22, 2006.  (*See* Mar. 22, 2006 Circuit Ct. Order, docket #23.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same issues.  On November 9, 2006, the Michigan Court of Appeals denied leave to appeal for failure to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D).  (*See* Nov. 9, 2006 Mich. Ct. Appeals' Order, docket #23.)  The Michigan Supreme Court denied leave to appeal on the same grounds on May 30, 2007.  (May 30, 2007 Mich. Order, docket #23.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**<u>Discussion</u>**

**I.      Grounds I and II: Ineffective Assistance of Counsel**

Petitioner argues that he is entitled to habeas corpus relief because trial counsel was ineffective for failing to request jury instructions on self-defense and provocation.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### A.    Self-Defense

Outside the presence of the jury, trial counsel discussed a self-defense jury instruction with the court but decided against the instruction in light of Petitioner's decision not to testify and the Michigan Supreme Court's decision in *People v. Droste,* 125 N.W. 87 (1910). (Tr. IV at 580-81.) Counsel explained:

> I had given some thought to the idea of asking for [the self-defense jury instruction]. And the case law . . . says that the defense basically has to make an election and admit the crime if we're going to be claiming self defense. That's why I've not asked for a self defense instruction.

(Tr. IV at 602.) Under Michigan law, the use of deadly force against another in self-defense by one who is free from fault is justified if, under the circumstances, the person honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force. *People v. Riddle*, 649 N.W.2d 30, 34 (Mich. 2002). The touchstone of self-defense is necessity. The failure to retreat or otherwise avoid the intended harm may therefore indicate a lack of necessity in resorting to the use of deadly force. *Id.* at 35.[2]

On appeal, the Michigan Court of Appeals addressed Petitioner's claim as follows:

---

[2] For prosecutions involving crimes committed on and after October 1, 2006, the availability of a self-defense instruction is governed by statute, MICH. COMP. LAWS § 780.971. The statute is not retroactive. *See People v. Conyer*, 762 N.W.2d 198 (Mich. Ct. App. 2008). It therefore had no application to this case.

Defendant first asserts that his trial counsel was ineffective for failing to request that the jurors be instructed on self-defense. Claims of ineffective assistance of counsel are reviewed de novo. *In re CR,* 250 Mich App 185, 197; 646 NW2d 506 (2002). In order to prevail on his claim of ineffective assistance of counsel, "defendant must show (1) that the attorney's performance was objectively unreasonable in light of prevailing professional norms and (2) that, but for the attorney's error or errors, a different outcome reasonably would have resulted." *People v Harmon,* 248 Mich App 522, 531; 640 NW2d 314 (2001). The second prong, prejudice, requires that defendant demonstrate a probability of a different outcome sufficient to undermine the confidence in the outcome that actually resulted. *People v Carbin,* 463 Mich 590, 600; 623 NW2d 884 (2001).

The record reveals that defendant's trial counsel declined to request that the jurors be instructed on self-defense because he believed that, under our Supreme Court's decision in *People v Droste,* 160 Mich 66; 125 NW 87 (1910), he could not request the instruction when defendant had not admitted to the shooting. Defendant, however, asserts that *Droste* does not prevent him from requesting that the jurors be instructed on self-defense, even when he denies having committed the shooting, so long as the instruction is requested and there is evidence to support the theory because he is allowed to assert inconsistent defenses, relying on our Supreme Court's decision in *People v Heflin,* 434 Mich 482; 456 NW2d 10 (1990).

Even assuming, without deciding, that defendant is correct in his assertion that *Droste* does not prevent the jurors from being instructed on self-defense when defendant denied having shot Kenyatta, and that there was adequate evidence to support the instruction's being given, we do not believe that defendant has met his burden of establishing that his trial counsel was ineffective. Defendant's establishing that his trial counsel misinterpreted the law regarding whether the trial court was required to deliver the self-defense instruction, even if considered objectively unreasonable, and showing that there is a reasonable probability that the trial court would have been required to deliver the instruction had it been requested, does not fulfill his burden of establishing prejudice. Rather, in order to fulfill his burden of demonstrating a probability of a different outcome sufficient to undermine the confidence in his conviction, defendant must demonstrate that the evidence introduced at trial in support of his assertion of self-defense was sufficient to show a reasonable probability that the jury would have determined that he did, indeed, act in self-defense. In the present case we do not believe that defendant has done so.

In support of his assertion that evidence at trial supported the reading of the self-defense instruction, defendant relies solely upon the testimony of sergeant Gary Cheatum that, when he called defendant on his cell phone after the shooting, defendant stated "it was self defense. It was self defense. He [sic, She] pulled a gun on me [first]." However, there was no evidence introduced at trial to support defendant's assertion to Cheatum. Indeed, none of the witnesses that were present

when the shooting occurred testified that they saw Kenyatta, or anyone else other than defendant, with a gun at any time or supported defendant's assertion that Kenyatta was the initial aggressor. Further, the testimony of the officers that responded to the shooting and conducted the investigation establishes that no gun was found at the scene and that no information was ever received tending to show that anyone other than defendant had a gun on the night of the incident. Moreover, the only testimony presented at trial tending to show that Kenyatta did anything other than merely walk up the steps and stand behind Sandra Jones came from defendant's brother-in-law, Wilbur Sargent, who testified that Kenyatta and approximately six or seven of Kenyatta's friends followed him up the stairs as Sandra Jones was removing defendant from the house and that, as they were walking up the stairs, Kenyatta was "trash talking" to defendant. Sargent also testified that Kenyatta and his friends followed defendant outside the house and, thereafter, all of them began "trash talking" to defendant. However, Sargent testified that he did not see Kenyatta with a gun at any time and, moreover, walked away from the house in the opposite direction of defendant and, indeed, did not see the shooting. Thus, although it tends to show that Kenyatta may have been making comments to defendant, Sargent's testimony does not support defendant's assertion to Cheatum that Kenyatta either possessed a weapon or was the initial aggressor. Therefore, because the evidence supporting defendant's theory of self-defense consisted solely of his assertion to Cheatum and was not supported by any other evidence presented at trial, thus making it minimal, defendant has not demonstrated a probability of a different outcome sufficient to undermine the confidence in his conviction.

(MCOA Op. at *2-3.) The court of appeals relied upon the Michigan standard of review for claims of ineffective assistance of counsel. That standard is identical to the *Strickland* standard. *See People v. Pickens*, 521 N.W.2d 797 (Mich. 1994) (adopting *Strickland* standard for claims under the Michigan constitution).

The Michigan Court of Appeals only addressed the prejudice prong of the *Strickland* standard. To establish prejudice, Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

An examination of prejudice, however, "must not focus solely on mere outcome determination; attention must be given to 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Combs*, 205 F.3d at 278 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). The decision of the state appellate court was eminently reasonable, as Petitioner satisfies neither prong of *Strickland*.

In analyzing this issue, the Michigan Court of Appeals assumed for sake of argument that the evidence would have supported a self-defense instruction. It is clear, however, that the evidence was utterly insufficient and that counsel was not unreasonable in failing to request a futile instruction. A criminal defendant is entitled to an instruction on self-defense only when the defense is supported by the evidence. 649 N.W.2d 37; *People v. Mills*, 537 N.W.2d 909, 919-20 (Mich. 1995). Other than Petitioner's self-serving statement to Sergeant Cheatum that "it was self defense. It was self defense. He pulled a gun on me [first]," there was no other evidence at trial that supported Petitioner's claim of self-defense. (Tr. III, 522.) In his reply brief, Petitioner argues that the Michigan Court of Appeals ignored evidence that supported his theory of self-defense, such as the trash talk by "the mob" standing behind Kenyatta Jones, the pushing and shoving of Petitioner, and Kenyatta's reputation for carrying a gun (which the trial court ruled inadmissible). (Pet'r's Reply at 5, docket #31.) As outlined in detail by the Michigan Court of Appeals, none of the witnesses saw Kenyatta Jones with a gun that morning nor did any of the officers who responded to the scene find any evidence of a gun on anyone but Petitioner. Notably, several witnesses saw *Petitioner* pull out a gun, push Sandra Jones out of the way, identify Kenyatta Jones by his red shirt, aim the gun at Kenyatta's head and shoot. (Tr. II, 182, 184-85, 210-11, 239-41, 289-92.) Further, there was no evidence that the trash talk by the people standing behind Kenyatta on the stairs and the pushing of

Petitioner rose to such a level that Petitioner could have reasonably believed he was in imminent danger of death or great bodily harm and that it was necessary for him to exercise deadly force. *See Riddle*, 649 N.W.2d at 34. At the time Petitioner shot Kenyatta, Petitioner was standing outside. (Tr. II, 181, 234.) Kenyatta and "the mob" were standing on the stairs inside the house. (Pet.'r's Reply at 5, docket #31.) Petitioner could have easily retreated from the situation simply by walking away. The evidence simply did not support a self-defense instruction, and any request for such an instruction would have been frivolous. Counsel cannot be deemed ineffective in these circumstances. Counsel's failure to make a frivolous request does not constitute ineffective assistance of counsel. *See Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile).

Further, counsel's decision not to request the instruction clearly was strategic. Michigan law requires the defendant to admit the criminal act charged in order to maintain the defense. *See Heflin*, 456 N.W.2d 19 n.17; *Droste*, 125 N.W. at 93; *see generally People v. Lemons*, 562 N.W.2d 447, 453 n.15 (Mich. 1997). Consequently, Petitioner would have been required to take the witness stand, admit to the shooting and tell his story of self-defense in the hope that the jury would have accepted his version of events. In the present case, Petitioner stated on the record that he made the strategic decision not to testify. (Tr. III at 580-81). Because Petitioner did not testify, any such request for a self-defense instruction by counsel would have been futile.

Alternatively, as thoroughly explained by the Michigan Court of Appeals, Petitioner can show no prejudice from counsel's failure to charge the jury on self-defense. If defense counsel had made the request and the trial court had indulged it, the jury would have had no evidence upon

which to find for Petitioner. There was no reasonable probability that the jury would have found that Petitioner acted in self-defense when he shot an unarmed victim twice in the head. Accordingly, the Michigan Court of Appeals' decision was neither contrary to, nor involved an unreasonable application of, *Strickland*, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## B. Provocation

Petitioner claims that he is entitled to habeas corpus relief because trial counsel was ineffective for failing to request a jury instruction on provocation. Petitioner argues that an instruction on provocation would have negated the requisite intent for assault with intent to commit murder. *See People v. Pouncey,* 471 N.W.2d 346, 349-50 (Mich. 1991); *People v. Lipps,* 421 N.W.2d 586, 590 (Mich. Ct. App. 1988). In other words, Petitioner could not have been found guilty of assault with intent to commit murder if a charge of murder could have been reduced to manslaughter due to the finding of provocation. Voluntary manslaughter requires: (1) a defendant to kill in the heat of passion; (2) the passion must be caused by adequate provocation; and (3) there cannot be a lapse of time during which a reasonable person could control his passions. *Pouncey*, 471 N.W.2d at 350. Provocation is defined as "that which causes the defendant to act out of passion rather than reason." The provocation must be "adequate"- which is to say, it must "cause a *reasonable person* to lose control." *People v. Sullivan,* 586 N.W.2d 578, 582 (Mich. Ct. App. 1998) (emphasis in original). "The law does not excuse actors whose behavior is caused by just any . . . emotional disturbance . . . . Rather, the law asks whether the victim's provoking act aroused the defendant's emotions to such a degree that the choice to refrain from crime became difficult for the defendant." *Pouncey,* 471 N.W.2d at 349-50 (citation omitted).

The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim, as follows:

> Defendant next asserts that his trial counsel was ineffective for failing to request that the jury be instructed on provocation. Again, we disagree. Defendant correctly asserts that this Court has held that "if a defendant would have been guilty of manslaughter had the assault resulted in death (due to an absence of malice), there can be no conviction of assault with intent to murder." *People v Lipps,* 167 Mich App 99, 106; 421 NW2d 586 (1988). The elements of voluntary manslaughter are (1) that the defendant killed in the heat of passion, (2) that the passion was caused by adequate provocation, and (3) there was not a lapse of time during which a reasonable person could have controlled his passions. *People v Sullivan,* 231 Mich App 510, 518; 586 NW2d 578 (1998). It is the element of provocation that distinguishes manslaughter from murder. *Id.* The degree of provocation required to mitigate a homicide from murder to manslaughter "is that which causes the defendant to act out of passion rather than reason." *Id.* In order for the provocation to be adequate, it must be "that which would cause a *reasonable person* to lose control." *Id.* (emphasis in original). "The determination of what is reasonable provocation is a question of fact for the factfinder." *Id.* However, "[w]here, as a matter of law, no reasonable jury could find that the provocation was adequate, the judge may exclude evidence of the provocation." *Id.*
>
> The sole evidence of any provocation by Kenyatta in the present case consists merely of insulting words. Although our Supreme Court has declined to adopt a per se rule that insulting words may never constitute adequate provocation, *People v Pouncey,* 437 Mich 382, 389; 471 NW2d 346 (1991), we conclude that, based on the facts of this case, no reasonable juror could conclude that Kenyatta's words would have provoked a reasonable person to react as defendant did. Thus, there was insufficient evidence as a matter of law to establish adequate provocation. Therefore, defendant's assertion of ineffective assistance of counsel is without merit, because he has not shown that his trial counsel's failure to request the instruction was objectively unreasonable or that there is a reasonable probability that the outcome of his trial would have been different had his trial counsel requested the instruction. Further, counsel is not required to advocate a meritless position. *People v Snider,* 239 Mich App 393, 425; 608 NW2d 502 (2000).

(MCOA Op. at *3.)

The Michigan Court of Appeals' decision was a reasonable application of *Strickland*.

The Michigan Court of Appeals found that the insulting words by Kenyatta Jones did not constitute

adequate provocation as a matter of law.  Before Petitioner shot Kenyatta, Kenyatta testified that he told Petitioner, "[y]ou ain't all that." (Tr. II, 343-44.)  Valerie Deloach also testified that Kenyatta told Petitioner "fuck you" and "ain't nobody scared of you" before the shooting. (Tr. II, 239.)  A reasonable person would not lose control over those words, much less shoot another person in the head.  *See Sullivan,* 586 N.W.2d at 582.  Petitioner, however, aimed the gun toward Kenyatta's head and shot him.  (Tr. II, 182, 184-85, 210-11.)

In his reply brief, Petitioner urges the court to look to other circumstances that morning, such as (1) the pushing of Petitioner up the stairs by Sandra Jones, (2) six to seven people talking trash to Petitioner, and (3) the victim's history of carrying a gun.[3]  (Pet'r's Reply at 8, docket #31.)  A reasonable person would not lose control with the *victim*, Kenyatta Jones, because of the actions of Sandra Jones or  the trash talk by several other individuals.  *See Sullivan,* 586 N.W.2d at 582.  It is the victim's provoking act which must arouse the defendant's emotions. *See Pouncey,* 471 N.W.2d at 349-50 (citation omitted).  Because the victim's insulting words did not rise to the level of adequate provocation, counsel's failure to request a provocation instruction was not objectively unreasonable under *Strickland's* first prong.

Moreover, because the facts did not support a provocation instruction, any request for such instruction undoubtedly would have been denied by the court.  Petitioner therefore cannot demonstrate the necessary prejudice under the second prong of *Strickland*.  Accordingly, the Michigan Court of Appeals' determination constituted a reasonable application of established Supreme Court precedent.

---

[3]The trial court ruled that evidence of the victim's reputation for carrying a gun was inadmissible.  (Tr. III, 451.)

## II.    Waiver of Right to Counsel: Ground III

In his third ground for habeas corpus relief, Petitioner argues that he was denied the assistance of counsel when the trial court failed to instruct him on self-representation at his preliminary examination.

At the preliminary examination, Petitioner requested to proceed without a lawyer as follows:

> THE COURT: [Petitioner], you have a right to be represented by a lawyer. If you can't afford a lawyer, one will be appointed for you, and you have appointed public defender that's been appointed for you. It's my understanding you don't –you don't want to use that public defender or what?
>
> THE DEFENDANT: No, not after the conversation with the public defender, no.
>
> THE COURT: Well, you wish to proceed without a lawyer? I'm not going to appoint another public defender for you just because you can't get along with this guy.
>
> THE DEFENDANT: It ain't a point of gettin' along with the attorney. It's based on what the attorney was talking about that-- see-- already see where he's coming from. More or less, he's working with the prosecutor and not me–
>
> THE COURT: Well–
>
> THE DEFENDANT: -- based on what he said, so I don't think that I need him to represent me.
>
> THE COURT: So you-- you're waiving your right to an attorney at this point in time; is that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you want to proceed without a lawyer?
>
> THE DEFENDANT: I guess I'll waive my hearing.
>
> THE COURT: You'll waive your hearing? All right. You have the right to do that. You understand that this is the time and date set for a preliminary hearing on these two–three charges; assault with intent to do great bodily harm, felony firearm, and

firearm possession by a felon. You have a right to have the hearing today, and you also have the right to waive this hearing and proceed in circuit court on the charges; is that what you wish to do?

THE DEFENDANT: No.

THE COURT: All right. Deputy, if you'd -- for the purposes of the preliminary hearing, I will discharge Mr. Iverson however, I'm going to continue on with the public defender's office at a later time.

(Prelim. Hr'g at 3-4, docket #12.) After Petitioner's attorney was discharged, the state amended the

charges against Petitioner to include a charge of assault with intent to commit murder. The trial

court instructed Petitioner as follows:

THE COURT: So you're adding a count four; is that right?

[PROSECUTOR]: Yes.

THE COURT: Assault with intent to--

[PROSECUTOR]: Murder.

* * *

THE COURT: And the assault with intent to murder is--carries with it what penalty?

[PROSECUTOR]: Life.

THE COURT: Life penalty. Do you understand what they're doing, [Petitioner]?

THE DEFENDANT: I--more or less I understand what you're talking about. What he's trying to basically do is change the count--original count.

THE COURT: They're adding another count. They're--the other counts remain the change--the same except they're adding an additional count saying that you assault-- there was an assault with an intent to murder involved in this whole thing, and that, as the --a felon in possession of a firearm and defining your felony charge, they are adding another identifier--another felony that they say you've been convicted of; so that does not change the --the maximum penalty on that charge at all. It just gives you more specifics as to what it entails.

* * *

THE COURT: The question is, do you wish to have a hearing on these charges, or not?

THE DEFENDANT: Yep.

(Prelim. Hr'g at 5-6.)   The victim, Kenyatta Jones, then testified at the hearing and Petitioner cross-examined him.   At the end of the hearing, the trial court bound Petitioner over on all four charges. (Prelim. Hr'g at 16.)

The Michigan Court of Appeals addressed Petitioner's constitutional claim as follows:

> Defendant also asserts that his convictions must be reversed because the trial court allowed him to dismiss his counsel at the beginning of his preliminary examination and did not inform him of the dangers of self-representation.   Again, defendant's assertion is without merit.
>
> Under the Sixth Amendment, a criminal defendant has the right to the assistance of counsel at "critical stages" of the proceedings, which includes preliminary proceedings where there is the potential that the defendant may sacrifice rights or lose defenses.   *People v Green*, 260 Mich App 392, 399; 677 NW2d 363 (2004) (citations omitted).   However, our Supreme Court has also recognized that, in Michigan, a criminal defendant is guaranteed the right to waive the assistance of counsel and proceed in propria persona.   *People v Adkins* (*After Remand*), 452 Mich 702, 720; 551 NW2d 108 (1996), citing Const 1963, art 1, § 13 and MCL 763.1.   However, strict guidelines exist with which a trial court must comply before allowing a defendant to waive his right to counsel and exercise his right to proceed in propria persona.   *People v Hicks*, 259 Mich App 518, 523; 675 NW2d 599 (2003) (citations omitted).
>
> The trial judge in the present case did not comply with all of the necessary procedures.   Specifically, although defendant's request to represent himself was unequivocal, the trial court did not advise defendant of the risks and disadvantages of exercising his right to proceed in propria persona.   *Hicks*, *supra*, 523. Nonetheless, we do not believe that this error is sufficient to require reversal. Specifically, this Court has stated that "an error in the preliminary examination procedure must have affected the bindover and have adversely affected the fairness or reliability of the trial itself to warrant reversal." *People v McGee*, 258 Mich App 683, 698; 672 NW2d 191 (2003).   In the present case, defendant's only assertion relating to an effect on the bindover is that he was improperly bound over on the charge of assault with intent to commit murder, which was added at the preliminary

examination after he had dismissed his counsel. However, as discussed above, we believe that any error in the trial court's allowing the prosecutor to add the new count, if not waived, was harmless. As to the fairness or reliability of the trial, defendant was appointed new counsel approximately two weeks after the preliminary examination, who represented him throughout the remainder of the pretrial proceedings and during the course of trial, and defendant does not assert that his counsel was prevented from asserting any defenses as a result of defendant's having appeared in propria persona.

(MCOA Op. at *5.) The appellate court referred to another section of its opinion, which discussed the harmlessness of the trial court's decision to amend Petitioner's charges by adding a charge of assault with the intent to commit murder at the preliminary examination. The Michigan Court of Appeals continued:

We believe that, under the facts of the present case, any error was harmless.

Specifically, because defendant admits that he was arraigned on the original charges, and because the record indicates that he signed an advice of rights form on the same date that he was arraigned on those charges, defendant does not dispute that he was informed of his right to counsel, that bail was fixed, and that the preliminary examination was fixed. Further, the trial judge informed defendant of the maximum penalty for the charge of assault with intent to commit murder at the preliminary examination. Moreover, at trial, after defendant had retained counsel, a lengthy plea discussion was held on the record during which the trial court explained to defendant the possible sentence that could be imposed if he were convicted of assault with intent to commit murder and also explained what the penalty would be if defendant were to plead guilty, after which defendant elected to exercise his right to a jury trial. Thus, the purposes of arraignment stated in *Thomason*, *supra*, 815, were met in the present case. Finally, the added charge of assault with intent to commit murder differs from the charge of assault with intent to commit great bodily harm, on which defendant was arraigned, only with respect to the element of intent. MCL 750.83; MCL 750.84. Thus, because the addition of the charge of assault with intent to commit murder was based on the same facts and evidence upon which defendant had been charged with assault with intent to commit great bodily harm, defendant was not prejudiced in his ability to prepare his defense.

(MCOA Op. at *4-5.)

The Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance of counsel in his defense. *See* U.S. Const. amend. VI; *see also Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 154 (2000). A preliminary hearing is a critical stage of the state's criminal process at which a defendant is entitled to the aid of counsel. *Coleman v. Alabama*, 399 U.S. 1, 10 (1970). This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself. *Faretta v. California*, 422 U.S. 806, 832-34 (1975); *see also United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'") (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). Nevertheless, a defendant's waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent. *See Faretta*, 422 U.S. at 835; *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938). For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Whether a defendant's choice was made with 'eyes open' generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst,* 304 U.S. at 464-65. The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the

right to counsel.'"[4] *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005).  However, less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'"  *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

In its decision, the Michigan Court of Appeals relied on *People v. Hicks,* 675 N.W.2d 599 (Mich. Ct. App. 2003).  The *Hicks* case relied on the federal legal principle as set forth in *Faretta,* 422 U.S. 806, and cited Michigan cases thoroughly discussing federal legal precedent.  The court of appeals therefore clearly applied established Supreme Court precedent in reaching its decision.

Petitioner unequivocally waived his right to counsel at the preliminary examination.  (*See* Prelim. Hr'g at 3-4, docket #12.)  The trial court, however, did not instruct Petitioner on the dangers and disadvantages of self-representation on the record.  The Michigan Court of Appeals therefore concluded that the trial court erred.  Although the Supreme Court has not provided a particular inquiry for a trial court to recite in accepting a defendant's waiver of counsel, the *Faretta* Court noted that a defendant *should* be made aware of the dangers and disadvantages of self-representation for a waiver to be knowing and intelligent.  *See Faretta*, 422 U.S. at 835 (emphasis added).  The Sixth Circuit and other circuits, however, have found that a defendant's waiver of counsel at trial satisfies the constitution even when the trial court does not explain the risks of self-

---

[4]The Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in *1 Bench Book for United States District Judges* 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney.  *King v. Bobby,* 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.3d 245, 250 (6th Cir. 1987).  However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent.  *King,* 433 F.3d at 492.  Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel. *Id.*  Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver. *Id.*

representation. *See Swiger v. Brown*, 86 F. App'x 877, 881 (6th Cir. 2004) (citing *Dallio v. Spitzer*, 343 F.3d 553, 564 (2d Cir. 2003) (*Faretta*'s holding and its dicta does not clearly establish that explicit warnings about the dangers and disadvantages of self-representation are a minimal constitutional prerequisite to every valid waiver of the right to counsel); *but see Fowler v. Collins*, 253 F.3d 244, 249-50 (6th Cir. 2001) (the Sixth Circuit found a constitutional violation where defendant made it clear that he wanted to proceed *pro se* at trial but the record included no evidence that he understood the dangers and disadvantages of self-representation and the trial court did not explore the basis for his waiver of counsel). Nevertheless, this Court does not need to make a determination on whether or not the trial court erred in failing to instruct Petitioner on the dangers and disadvantages of self-representation. Even if the trial court violated Petitioner's rights under the Sixth Amendment, the trial court's error was harmless.

On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (citing *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. If upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but very slight effect," the conviction must stand. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

The Michigan Court of Appeals concluded that any error was harmless because Petitioner's waiver of counsel did not affect the bindover of the charge of assault with the intent to

commit murder or adversely affect the fairness of Petitioner's trial.[5]  Petitioner was without counsel

only for a brief period, commencing at the preliminary examination and ending well before trial.  The

evidence at the preliminary examination consisted only of the testimony of the victim, Kenyatta

Jones.  (Prelim. Hr'g at 7-13, docket #12.)  During the trial, Petitioner's counsel thoroughly cross-

examined the victim.  (Tr. II, 354-76.)  Because the only witness who testified at the preliminary

examination was extensively cross-examined by Petitioner's counsel at trial, the error of the trial

court did not prejudice Petitioner at trial.  It therefore was harmless.  As a consequence, the Michigan

Court of Appeals' decision was a reasonable application of established Supreme Court precedent.

## II.    Grounds IV, V, VI and VII:  Procedural Default

In his remaining four grounds of habeas corpus relief, Petitioner argues that the circuit

court never obtained *in personam* jurisdiction over him, the trial court erred when it failed to instruct

the jury on dead-locked juries, the trial court erred by failing to instruct the jury on all of the

elements for felony-firearm and felon in possession of a firearm, and the trial court erred when it

permitted testimony from non-testifying witnesses and when it allowed the prosecution witnesses

to perjure themselves.

Respondent argues that Petitioner's fourth, fifth, sixth and seventh habeas grounds

are procedurally defaulted.  (Resp't's Answer at 22, docket #8.)  Those grounds were not raised in

his direct appeal to either the Michigan Court of Appeals or the Michigan Supreme Court.  Petitioner

---

[5]Petitioner argues that the use of the harmless error doctrine to evaluate his claim violates the Supreme Court's
holding in *McKaskle v. Wiggins,* 465 U.S. 168 (1984).  (Pet'r's Reply at 10, docket #31.)  *In McKaskle,* the Supreme
Court held that harmless error cannot apply where a court denies the defendant his right to self-representation at trial.
"Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome
unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis."  *Id.* at 177 n.8.  Because the error
occurred only at the preliminary examination, not at trial, the harmless error standard applies.  *See Coleman*, 399 U.S.
at 10-11.

raised those claims for the first time in his motion for relief from judgment, which was denied by the Michigan Court of Appeals and the Michigan Supreme Court on the grounds that Petitioner had failed to demonstrate entitlement to relief under Michigan Court Rule 6.508(D).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is

more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Here, both the Michigan Court of Appeals and the Michigan Supreme Court expressly stated that they denied Petitioner's application for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)." (Nov. 9, 2006 Mich. Court of Appeals' Order, docket #22; May 30, 2007 Mich. Supreme Court Order, docket #23.) Under Michigan Court Rule 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-007 (6th Cir. 2000). Because Michigan Court Rule 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place years thereafter, Michigan Court Rule 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.

Because Petitioner's fourth, fifth, sixth and seventh grounds for habeas corpus relief are procedurally defaulted, in order to be entitled to habeas review, he must demonstrate either cause excusing his default and actual prejudice or that he is actually innocent of the crimes for which he

was convicted. Here, Petitioner identifies no factor that could constitute cause excusing his default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Moreover, Petitioner does not contend that he is actually innocent, nor could he on these facts. As a result, he cannot meet the miscarriage-of-justice exception to the procedural bar. I therefore recommend that Petitioner's fourth, fifth, sixth and seventh habeas ground be denied because they are procedurally defaulted.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated: September 7, 2010                    /s/  Joseph G. Scoville
                                            United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).